UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ROSA RODRIGUEZ,                                      :

              Plaintiff,                      :            16 Civ. 8752 (AJP)

         -against-                               :            **OPINION & ORDER**

NANCY A. BERRYHILL,                                  :
Acting Commissioner of Social Security,
                                            :

              Defendant.                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**ANDREW J. PECK, United States Magistrate Judge:**

          Plaintiff Rosa Rodriguez, represented by counsel, brings this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits ("DIB"). (Dkt. No. 1: Compl.)  Presently before the Court are the parties' cross motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). (Dkt. No. 10: Rodriguez Notice of Mot.; Dkt. No. 14: Comm'r Notice of Mot.)  The parties have consented to decision of the case by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Dkt. No. 9.)

          For the reasons set forth below, the Commissioner's motion for judgment on the pleadings (Dkt. No. 14) is <u>GRANTED</u> and Rodriguez's motion (Dkt. No. 10) is <u>DENIED</u>.

**FACTS**

**<u>Procedural Background</u>**

          Rodriguez filed for benefits on April 7, 2011, alleging a disability onset date of October 21, 2010. (Dkt. No. 7: Administrative Record ("R.") 254-58.)  On April 25, 2012, Rodriguez, represented by counsel, had a hearing before Administrative Law Judge ("ALJ") Robert

Dorf, who denied Rodriguez's benefits application. (R. 85-108, 123-33.) On June 28, 2013, the Social Security Appeals Council remanded the matter for further proceedings before ALJ Dorf, including obtaining vocational expert testimony. (R. 134-37.)

On November 13, 2013, Rodriguez, still represented by counsel, attended a second hearing before ALJ Dorf. (R. 47-84.) On March 24, 2014, ALJ Dorf issued a written decision finding Rodriguez not disabled within the meaning of the Social Security Act. (R. 29-41.) ALJ Dorf's decision became the Commissioner's final decision when the Appeals Council denied review on September 12, 2016 and March 21, 2017. (R. 1, 3-6.)

## Non-Medical Evidence and Testimony

Born on November 1, 1968, Rodriguez was forty-one years old at the alleged October 21, 2010 onset of her disability. (R. 58, 255-56.) Rodriguez lives with her husband and two children, ages eighteen and seven months. (R. 55.) Rodriguez sometimes is able to lift and change her seven month old, who weighs seventeen pounds, and take him to appointments or the grocery store once every one or two weeks. (R. 56-57, 70, 275.) She can lift a gallon of milk (R. 103), has no issues with personal care (R. 272-73), and watches television and talks on the phone daily (R. 275-76). Rodriguez prepares food daily (R. 273) but experiences pain in her arms and back when she cooks or washes dishes (R. 107, 278). Rodriguez is able to pay bills and handle a savings account. (R. 275.) She has no issues getting along with family, friends, neighbors or others, and no problems paying attention or following written and spoken instructions. (R. 276, 278.)

When her husband is unavailable, Rodriguez drives to appointments, or takes the bus or train. (R. 60, 63, 274.) Rodriguez does not use an assistive device such as a cane when she "take[s] the train, or bus, or walk[s]" (R. 63, 101) although she suffers from low back pain (R. 57-58, 277) and testified that she "can only stand up for two minutes because [her] muscles start bothering"

her (R. 74). Rodriguez testified that she can walk two blocks before she has to stop and rest, and sit for ten to twenty minutes at a time (R. 102, 106, 278), but there are times when sitting is unbearable and she has to lay down (R. 75). Rodriguez described the pain in her neck and back as an eight to nine out of ten. (R. 102-03.) Rodriguez previously worked as a home attendant and babysitter (R. 59, 65, 103) although she can no longer perform such work because she "just freeze[s] up [and her] muscles tense" (R. 63).

Vocational expert Helene Feldman testified that a person of Rodriguez's age, education, vocational background and RFC could not perform the duties of a home attendant or babysitter, but that sedentary jobs existed in significant numbers in the national economy that such an individual could perform, including plastic design applier, stuffer, and gauger. (R. 64-68.)[1] These jobs all are sedentary positions that could be performed either sitting or standing. (R. 66-68, 81-82.)

**Medical Evidence Before the ALJ**

**Physical Impairments**

**Dr. Vikas Varma**

On September 20, 2010, Dr. Vikas Varma examined Rodriguez, who complained of progressively worsening pain in the back, hip, buttocks and legs causing cramps, numbness, weakness and tingling with no relief from medication or physical therapy. (R. 337.) Dr. Varma found Rodriguez's strength "[g]ood 5/5 in all" muscle groups in the upper and lower extremities with

---

[1]     ALJ Dorf specifically asked VE Feldman to "assume a hypothetical individual [with a] sedentary residual functional capacity with a sit, stand at will option in place; occasional overhead reaching; limited to simple[,] repetitive work at low stress, defined as no decision making required; occasional contact with the public, co-employees, and supervisors; no postural, except occasional stairs." (R. 65.)

no wasting, weakness, atrophy or fasciculations.  (R. 338.)  Rodriguez had a positive straight leg test and her MRI showed multilevel L3-4, L4-5, and L5-S1 disc bulges.  (Id.)  Dr. Varma examined Rodriguez on October 18, 2010 at which time her muscle strength remained "5/5," but her thoracic and lumbar pain was progressively worse.  (R. 339.)  An electrodiagnostic study revealed mild right carpal tunnel syndrome and chronic bilateral L5-S1 radiculopathy.  (R. 344.)

On November 1, 2010, November 29, 2010 and January 3, 2011, Dr. Varma completed continued disability statements in which he opined that Rodriguez cannot do any heavy lifting, pulling, pushing, or bending.  (R. 348-50.)  Dr. Varma diagnosed Rodriguez with lumbar radiculopathy, and he opined that Rodriguez should not sit or stand for longer than four hours and cannot return to work even with restrictions.  (Id.)

On June 8, 2011, Dr. Varma completed a spinal impairment questionnaire, listing the "[d]ate of most recent exam" as January 3, 2011.  (R. 404-10.)  Dr. Varma reiterated that Rodriguez had disc bulges at L3-L4, L4-L5 and L5-S1 and degenerative disc disease.  (R. 404.)  Rodriguez had limited range of motion in her cervical and lumbar spine, tenderness and reflex changes in her lumbar spine, a positive straight right leg raise test at 25 degrees, and burning low back pain that radiated to her right leg daily, precipitated by bending and carrying heavy items.  (R. 404-07.)  Rodriguez had no muscle spasms, sensory loss, muscle atrophy or weakness in her cervical or lumbar spine, and no abnormal gait, swelling, crepitus or trigger points.  (R. 405.)  Dr. Varma opined that Rodriguez could sit for four hours and stand or walk for two hours in an eight hour workday; however, Rodriguez would have to take five minute breaks two to three times during her workday, and her impairments would cause her to be absent more than three times a month.  (R. 407, 409.)  Rodriguez could lift five pounds frequently and ten pounds occasionally, and carry up to ten pounds occasionally, but could never lift or carry any weight over ten pounds.  (R. 407-08.)

Rodriguez could do no pushing, pulling, kneeling, bending or stooping. (R. 410.) Rodriguez's symptoms would frequently interfere with her attention and concentration and were expected to last at least twelve months. (R. 408.) In the "[a]dditional comments" section, Dr. Varma wrote that Rodriguez "does not wish to try epidural injections to relieve symptoms." (R. 410.) Dr. Varma reiterated these findings in an April 6, 2012 "To Whom It May Concern" letter. (R. 541.)

### Dr. Teresella Gondolo

On January 20, 2011, Dr. Teresella Gondolo evaluated Rodriguez for her complaints of neck and low back pain, difficulty walking, numbness and paresthesias of the upper and lower extremities with antalgic gait. (R. 386.) Rodriguez also complained of episodes of lightheadedness, dizziness and vertigo. (Id.) Rodriguez denied joint pain, swelling, muscle cramps, stiffness or arthritis. (R. 387.) On examination, Dr. Gondolo noted neck stiffness with no reduction of movement, mild tenderness in the paracervical and sternocleidomastoid, no lower back tenderness in the lumbosacral and sacroiliac region, a negative foramina compression test, and a normal thoracic spine examination. (R. 389.) Rodriguez's muscle strength was "5/5" in her bilateral upper and lower extremities and she had normal gait, tiptoe and heel walk. (R. 390.) Rodriguez's cervical spine examination revealed tenderness and diminished range of motion "in all cervical planes secondary to pain." (R. 391.) Rodriguez also experienced pain in her lumbar spine on flexion with diminished range of motion, "visible spasm as well as tenderness at [the] L4-L5 level," "bilateral paralumbar tenderness and spasm," and positive "[s]acroiliac joint palpation" and a positive straight leg raise at 40 degrees. (Id.) Dr. Gondolo diagnosed Rodriguez with cervical and lumbar radiculopathy. (Id.)

On March 17, 2011, Dr. Gondolo opined, without explanation, that Rodriguez was "totally disabled for 12 months due to lumbar radiculopathy." (R. 486.) Dr. Gondolo completed a

continued disability statement form on February 10, 2011 and another after Rodriguez's March 17, 2011 visit. (R. 351-52.) Both forms diagnose Rodriguez with lumbar radiculopathy and state that Rodriguez cannot return to work even with restrictions. (Id.) The latter report states that Rodriguez cannot stand for more than two hours, cannot do any lifting, pushing and pulling over five pounds, and is "totally disabled." (R. 352.)

### Industrial Medicine Associates

Dr. Marilee Mescon of Industrial Medicine Associates performed an internal medicine examination of Rodriguez on May 17, 2011. (R. 510-13.) Dr. Mescon noted that Rodriguez had a history of low back pain that radiated to her hips, feet and neck that was worse when standing, rated "10/10" and improving to "6/10" with medication. (R. 510.) Rodriguez could cook, shower, bathe and dress, and spent her time listening to the radio, watching television and reading; family members did the cleaning, laundry and shopping. (R. 511.) Rodriguez appeared in no acute distress, with normal stance and gait, could walk on heels and toes without difficulty, could fully squat, used no assistive devices, was able to rise from the chair without difficulty and needed no help changing or getting on and off of the exam table. (Id.) Rodriguez's cervical and lumbar spine showed full flexion, extension and lateral flexion bilaterally, and full rotary movement bilaterally; no scoliosis, kyphosis or abnormality in the thoracic spine was noted. (R. 512.) However, Rodriguez's straight leg raise test was positive bilaterally in a supine and seated position. (Id.) Rodriguez had full range of motion in her shoulders, elbows, forearms and wrists bilaterally, stable and non-tender joints, and full strength in her upper and lower extremities. (Id.) Based on her examination, Dr. Mescon found that there were no limitations in Rodriguez's ability to sit, stand, climb, push, pull or carry heavy objects. (R. 513.)

Two days later, on May 19, 2011, an x-ray of Rodriguez's lumbosacral spine showed

that the height of the vertebral bodies and intervertebral disc spaces was "relatively well maintained" with "[n]o significant bony abnormality" (R. 514), which Dr. Mescon appears to have considered by hand writing the results into her May 17, 2011 evaluation (R. 512).

On August 13, 2013, Rodriguez underwent a second internal medicine examination with Dr. Aurelio Salon of Industrial Medicine Associates. (R. 583-87.) Rodriguez presented with complaints of low back and neck pain radiating to her upper and lower extremities. (R. 583.) Rodriguez appeared in no acute distress with normal gait and stance, could walk on heels and toes without difficulty, used no assistive devices, needed no help getting on and off of the exam table or changing, and was able to rise from the chair without difficulty. (R. 585.) Rodriguez's cervical and lumbar spine showed full flexion, extension, lateral flexion bilaterally, and rotary movement bilaterally, with no scoliosis, kyphosis or abnormality in the thoracic spine. (Id.) Rodriguez's straight leg raise test was negative bilaterally, and she had full range of motion in her shoulders, elbows, forearms, wrists, hips, knees and ankles bilaterally. (Id.) Dr. Salon found that there were "no objective findings to support the fact that [Rodriguez] would be restricted in her ability to sit or stand, or in her capacity to climb, push, pull, or carry heavy objects." (R. 586.)

On August 14, 2013, Dr. Salon completed a medical source statement that stated Rodriguez could frequently lift and carry up to ten pounds and occasionally twenty pounds, and could sit and stand for eight hours and walk for five hours total in an eight-hour workday. (R. 588-89.) Rodriguez occasionally could reach, push, pull, climb stairs or ladders, balance, stoop, kneel, crouch, and crawl. (R. 590-91.) Dr. Salon stated that Rodriguez's limitations would not last for twelve consecutive months. (R. 593.)

**Queens Medical Associates**

On August 23, 2010, Rodriguez saw Dr. Nina Bhambhani with complaints of joint

pain in her knees, shoulders, wrists and elbows, as well as muscle pain and insomnia. (R. 367.) Rodriguez was in no acute distress with no synovitis, tenosynovitis, enthesitis or bursitis, although she had multiple tender points. (Id.) Dr. Bhambhani referred Rodriguez for epidural injections due to her persistent fibromyalgia and radiculopathy as Rodriguez had "failed P.T. and oral meds." (Id.) On September 13, 2010, Rodriguez's joint pain and insomnia had improved but her muscle pain had not. (R. 366.) On October 8, 2010, Rodriguez reported improved joint and muscle pain as well as decreased severity of her tender points, but still experienced radicular pain. (R. 365.)

On April 12, 2011, Rodriguez saw Dr. Ji Han and claimed that her pain was "10/10" and overall function poor. (R. 398.) Rodriguez stated that her lower back pain radiated to her legs with prolonged walking or standing, and was relieved by rest, laying down and sitting. (Id.) Dr. Han noted that Rodriguez's September 2009 MRI revealed "L3/4 disc bulge causing a small ventral impression upon the thecal sac, L4/5 and L5/S1 [disc] bulges which impinge upon the thecal sac [and] minimal degenerative disease." (R. 399.) Rodriguez complained of stiffness, but denied joint pain, joint swelling or muscle cramps and was in no acute distress. (Id.) Rodriguez's thoracic spine was negative for kyphosis or scoliosis. (R. 400.) She had full lumbar spine flexion, extension, lateral flexion and rotation with no tenderness or spasm; full lower extremity muscle strength bilaterally; and tenderness, but not spasms, in her paravertebral spine. (Id.) Rodriguez's left and right straight leg raise, bowstring and lesique tests were positive. (Id.) Rodriguez presented to Dr. Han with substantially the same symptoms on June 21, 2011. (R. 687-88.)

On July 27, 2011, Rodriguez complained to Dr. Han of lower back pain causing tingling and weakness with limited flexion and extension, but no spasms or tenderness, in her lumbar spine. (R. 706.) Rodriguez's bowstring test was negative, but she had a bilateral positive straight leg raise test. (Id.) Dr. Han administered Rodriguez a transforaminal epidural steroid

injection at L5 and S1 on August 25, 2011 (R. 704), and Dr. Han wrote on September 6, 2011 that Rodriguez reported "minimal relief following the proced[ure], continues to have lower back pain into the right lateral thigh, postero/lateral calf, and shin with associated right leg numbness, tingling and weakness of the right leg" (R. 702).

Aside from Drs. Bhambhani and Han, Rodriguez received the most extensive treatment from Dr. Alberto Rozo and Carolina Perez, RPAC, whom she saw at least fifteen times from October 9, 2010 through September 26, 2013. (R. 357-64, 603-04, 611-13, 615-35.)[2] As ALJ Dorf noted (R. 38), Dr. Rozo uses a "Review of Systems" list in which positive symptoms are marked in bold (see, e.g., R. 357). From 2010 through 2013, "Back Pain" is bolded only twice, on June 7, 2011 and December 12, 2011. (R. 625, 631.) On June 7, 2011, Perez wrote that Rodriguez "[h]as back tenderness" and was "sent to pain management," without further explanation. (R. 632.) On December 12, 2011, Perez wrote: "[b]ack pain/lumbar disc herniation–sent for epidural injections/pain management." (R. 626.) However, on thirteen other occasions from October 9, 2010 through January 20, 2013, "Back Pain" was not bolded, and Perez or Dr. Rozo wrote that Rodriguez had "[n]o back tenderness" and appeared "[a]lert, well developed, well nourished [and] in no acute distress." (R. 357, 359, 361-63, 611-12, 615, 617-21, 623-24, 627, 629.) Perez made the same observations on June 21, 2013 and July 12, 2013. (R. 606, 609.) Moreover, on June 21, 2013, Perez noted that Rodriguez had a pain assessment of zero. (R. 608-09.)

### Dr. Casilda Balmaceda

Rodriguez saw neurologist Dr. Casilda Balmaceda on October 31, 2011, December 6, 2011 and February 7, 2012 with complaints of daily chronic back pain that traveled into her neck

---

[2] Perez appears to have drafted the treatment notes that were then reviewed and signed by Dr. Rozo. (See, e.g., R. 357-58.)

and head made worse by walking.  (R. 428-36.)  Rodriguez appeared alert and oriented, in no acute distress with normal motor strength, reflexes and gait, and full range of motion.  (R. 429, 432, 435.) Dr. Balmaceda further reported in her February 7, 2012 notes that an epidural Rodriguez received "did not help" her pain.  (R. 434.)  On November 10, 2011, Dr. Balmaceda received the results of Rodriguez's lumbar spine MRI, revealing mild degenerative spondylosis, disc bulges and small endplate spurs at L3-L4, L4-L5 and L5-S1.  (R. 413.)  On November 21, 2011, Dr. Balmaceda received the results of Rodriguez's cervical spine MRI showing C4-C7 "disc bulges, resulting in bilateral C4-C5 neural foramen stenosis with uncovertebral spurring."  (R. 416.)  On February 10, 2012, Rodriguez continued to complain of chronic back and neck pain that was "worse now."  (R. 437-38.)  However, Rodriguez was alert and oriented and in no acute distress with normal motor strength, reflexes and gait, and full range of motion.  (R. 438.)

On February 12, 2012, Dr. Balmaceda completed a spinal impairment questionnaire (R. 419-25), diagnosing Rodriguez with lumbar and cervical stenosis with a fair prognosis (R. 419). Dr. Balmaceda opined that Rodriguez had limited range of motion in her lumbar and cervical spine with paraspinal spasms in the cervical spine, lumbar spasms, abnormal gait, cervical spine crepitus, paraspinal trigger points, a positive left straight leg raise test, and was capable only of limited bending.  (R. 419-20.)  Dr. Balmaceda opined that, in an eight hour workday, Rodriguez could sit for two hours and stand/walk for one hour, and would have to get up and move around every one to two hours for a period of fifteen to twenty minutes before sitting again.  (R. 422.)  Dr. Balmaceda opined that Rodriguez occasionally could lift and carry five pounds, but never anything heavier.  (R. 422-23.)  According to Dr. Balmaceda,  Rodriguez's pain was severe enough to frequently interfere with her attention and concentration, and her symptoms were expected to last at least 12 months. (R. 423.)  Rodriguez's impairments, moreover, would cause her to be absent from work more than

three times per month.  (R. 424.)  Dr. Balmaceda stated that Rodriguez's condition would interfere with her ability to keep her neck in a constant position and she could not perform a job that required her to do so.  (Id.)  Dr. Balmaceda further stated that Rodriguez suffered from depression and could not tolerate even a low stress work environment.  (Id.)  Dr. Balmaceda wrote that Rodriguez had psychological limitations, would need to avoid heights, and could not push, pull, kneel, bend or stoop.  (R. 425.)

On May 1 and July 18, 2012, Rodriguez complained of chronic, daily neck and back pain.  (R. 673-74, 676-77.)  Dr. Balmaceda wrote that "the pain is severe" and made worse by walking.  (R. 674, 677.)  Rodriguez had two epidural injections, most recently in January 2012, that "helped a bit" but "that it was not worth using another injection."  (R. 674, 677.)  Rodriguez appeared alert and oriented in no acute distress, with normal gait, reflexes and motor strength, and full range of motion.  (R. 674-75, 677-78.)  Dr. Balmaceda wrote on July 18, 2012 that she would order Rodriguez a lumbar brace to "prov[i]de stability and pre[]vent further neurological damage. The brace is required to make sure t[]hat her spi[]ne does not get worse, and that she does not require surgery at all."  (R. 673.)  On April 22, 2013, Rodriguez continued to complain of chronic neck and back pain; she was pregnant at the time with a delivery date sometime that month.  (R. 670.)  Dr. Balmaceda wrote that Rodriguez could not use a lumbar brace due to her pregnancy.  (Id.) However, Rodriguez again appeared alert and oriented in no acute distress, with normal gait, reflexes and motor strength, and full range of motion.  (R. 672.)

On June 28, 2013, an MRI of Rodriguez's lumbar spine showed that "[a]ll lumbar vertebral bodies are maintained in height" with "no evidence of fracture, marrow replacement disease, spinal stenosis or intrathecal mass."  (R. 598.)  Rodriguez had mild disc desiccation at L3-L4 with a "2-3 mm smooth central disc bulge" without herniation or impingement; mild disc

desiccation at L4-L5 without bulge or herniation; and mild disc desiccation at L5-S1 "with bilateral foraminal disc protrusions greater on the left than on the right" with impingement on the exiting left L5 root and crowding of the exiting right L5 root. (Id.) On July 27, 2013, Rodriguez underwent an electrodiagnostic study that revealed evidence of a subacute or chronic L5-S1 lumbo-sacral radiculopathy. (R. 597.)

Rodriguez had an MRI of her cervical spine on September 27, 2013 that showed no interval change in appearance from her prior November 21, 2011 MRI. (R. 735; see page 10 above.) The MRI revealed minimal central disc bulges at C4-C5, C5-C6, and C6-C7 with mild bilateral uncovertebral joint hypertrophy. (R. 735.)

Summarizing notes from prior visits that do not appear to be in the record, Dr. Balmaceda wrote that as of November 2013, Rodriguez occasionally had so much pain that she could "barely get her 5 month old son from the crib," although her Flexeril and Tramadol medications "help[ed] a lot together." (R. 727.) In January 2014, Rodriguez noted moderate pain when standing along with neck pain; Dr. Balmaceda added that "[t]he epidurals helped in the past." (Id.)[3]

---

[3] On July 31, 2014, Dr. Balmaceda wrote that Rodriguez was "completely disabled" "due to a multiplicity of structural problems" and "severe chronic pain" syndrome that included "[s]evere worsening of her back pain and sp[a]sms." (R. 726.) A September 12, 2014 MRI of Rodriguez's lumbar spine showed no overall change in comparison to her previous lumbar spine MRI on June 28, 2013. (R. 740; see page 11 above.) Although Dr. Balmaceda's July 31, 2014 assessment and her records from July 2016 submitted to the Appeals Council (R. 4, 10-15) may indicate worsening symptoms, the Court does not consider records that post-date ALJ Dorf's March 24, 2014 decision. See, e.g., Tricarico v. Colvin, No. 15-3786, 2017 WL 902603 at *3 (2d Cir. Mar. 3, 2017); Burch v. Comm'r of Soc. Sec., 15 Civ. 9350, 2017 WL 1184294 at *16 (S.D.N.Y. Mar. 29, 2017) ("The Appeals Council did not err in finding that the . . . post-decision reports did not relate back to the Relevant Period and were therefore immaterial to review of [the claimant's] claim."); O'Dell v. Colvin, 16 Civ. 368, 2016 WL 6882861 at *6 n.12 (S.D.N.Y. Nov. 22, 2016) (Peck, M.J.) ("The record contains (continued...)

**Physical Therapists**

Rodriguez received physical therapy from Alexander Dolsky from November 22, 2010 through March 18, 2011. (R. 532-39.) On November 22, 2010, Rodriguez complained of lower back pain and moderate lumbar muscle spasms that "began a month ago without apparent reason." (R. 532.) Dolsky diagnosed Rodriguez with lumbar radiculopathy. (Id.) Dolsky's remaining notes through March 18, 2011 provide little detail (and are difficult to read) other than Rodriguez's continued complaints of low back pain, and Dolsky's note that she tolerated treatment well. (See R. 532-39.) In his final treatment note on March 18, 2011, Dolsky wrote that Rodriguez "shows gradual improvement," but would benefit from continued physical therapy. (R. 537.)

On April 18, 2012, physical therapist Dr. Rowell Arguelles completed a "To Whom it may concern" check-the-box form stating that Rodriguez had received physical therapy eight times at Washington Heights Physical Therapy since March 27, 2012 for neck and lower back pain, loss of motion and muscle weakness in her cervical and lumbar spine, and difficulties performing activities of daily living. (R. 549.) Dr. Arguelles opined that Rodriguez's prognosis was fair to good. (Id.)

---

[3]/      (...continued)
additional Doctor's Progress Reports dated after ALJ Stacchini rendered his decision. Although new and material evidence may be submitted to the Appeals Council subsequent to an ALJ decision, such evidence must 'relate[ ] to the period on or before the date of the administrative law judge hearing decision.'" (quoting prior version of 20 C.F.R. § 404.970(b), record citation omitted)); 20 C.F.R. § 404.970(a)(5) ("The Appeals Council will review a case if . . . the Appeals Council receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision."); see also R. 4 ("This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before March 24, 2014. If you want us to consider whether you were disabled after March 24, 2014, you need to apply again."). In any event, Rodriguez makes no argument that these records relate to the period before ALJ Dorf's decision. (See Dkt. No. 11: Rodriguez Br. at 6-9; Dkt. No. 15: Comm'r Br. at 11 n.11.)

On April 24, 2012, Dr. Arguelles completed a multiple impairment questionnaire in which he diagnosed Rodriguez with cervical and lumbar radiculopathy with muscle spasms, and reiterated the symptoms outlined in his April 18, 2012 letter, as well as constant neck and lower back pain radiating to the upper and lower extremities. (R. 552-53.) Dr. Arguelles opined that Rodriguez's prognosis was fair to good. (R. 552.) In an eight hour workday, Dr. Arguelles opined that Rodriguez could only sit and stand for one hour, and she would need to get up and move around every one to two hours. (R. 554.) Rodriguez could occasionally lift and carry up to five pounds, but never more, and had significant limitations doing repetitive reaching, handling, fingering or lifting because of her disc bulges and cervical and lumbar spine stenosis. (R. 555.) Rodriguez had minimal limitations using her upper extremities to grasp, turn and manipulate objects, and moderate limitations using her arms for reaching, including overhead. (R. 555-56.) Dr. Arguelles stated that Rodriguez's symptoms would likely increase were she placed in a competitive work environment, and that her condition interfered with her ability to keep her neck in a constant position. (R. 556.) Rodriguez could perform no pushing, pulling, kneeling, bending or stooping and needed to avoid heights. (R. 558.) Dr. Arguelles opined that Rodriguez's symptoms were expected to last at least twelve months. (R. 557.)

### Dr. Frida Goldin

On July 6, 2012, Dr. Frida Goldin completed a spinal impairment questionnaire. (R. 562-68.) Dr. Goldin diagnosed Rodriguez with chronic cervicalgia, chronic lower back pain, foraminal stenosis, facet joint hypertrophy, and degenerative joint disease of the lumbar spine. (R. 562.) Dr. Goldin found that Rodriguez's prognosis was poor. (Id.) Rodriguez had limited range of motion, tenderness and muscle spasms in her cervical and lumbar spine, along with sensory loss, reflex changes and muscle weakness in her lumbar spine and a positive straight leg raise test

bilaterally. (R. 562-63.) Rodriguez suffered from chronic, constant neck and lower back pain; factors precipitating Rodriguez's pain included movement, standing, bending down, walking and sitting. (R. 564-65.) In an eight-hour day, Rodriguez could sit for three to four hours, and stand or walk for one to two hours; Rodriguez would have to get up and move around for five minutes every thirty to forty minutes before she could sit again. (R. 565.) Rodriguez could frequently lift and occasionally carry five pounds, and occasionally lift and carry ten pounds, but never anything heavier. (Id.) She could do no pushing, pulling, kneeling, bending or stooping. (R. 568.) Rodriguez's symptoms were severe enough to "[f]requently" interfere with her attention and concentration, and were likely to last at least twelve months. (R. 566.) Dr. Goldin opined that Rodriguez would be absent from work more than three times per month because of her condition. (R. 567.)

On the same day she completed the spinal impairment questionnaire, July 6, 2012, Dr. Goldin completed a "To Whom It May Concern" letter in which she reiterated her findings. (R. 570-74.) Dr. Goldin wrote that Rodriguez complained of "persistent, severe, neck pain and stiffness, which increases with movement . . . [and] lower back pain with radiation to her bilateral legs . . . worsened with standing, bending down, walking and sitting." (R. 570.) Dr. Goldin diagnosed Rodriguez with chronic intractable cervicalgia, chronic intractable lower back pain, discogenic cervical spine derangement/degeneration, lumbar spine foraminal stenosis, facet joints hypertrophy, lumbar spine degenerative joint disease and discogenic degeneration, and bilateral lumbo-sacral radiculopathy. (R. 572-73.) Dr. Goldin expected these symptoms to last more than twelve months. (R. 573.) Dr. Goldin wrote that Rodriguez's prognosis was "[p]oor." (R. 574.)

**Psychiatric Impairments**

**Industrial Medicine Associates**

Rodriguez underwent a consultative psychiatric evaluation with Dr. Haruyo Fujiwaki on August 13, 2013. (R. 575-78.) Rodriguez reported difficulty falling asleep, sometimes becomes forgetful, and at times "feels a little down and tired." (R. 575.) Rodriguez stated that at times she has anxiety and experiences palpitations and sweating, but denied manic and psychotic symptoms, a history of psychiatric hospitalizations or any psychiatric treatment. (Id.) Dr. Fujiwaki observed that Rodriguez's demeanor and responsiveness were cooperative, and her manner of relating, social skills and overall presentation were adequate. (R. 576.) Rodriguez had adequate speech, dysphoric affect, mildly dysthymic mood, clear sensorium, and she was oriented to person, place and time. (Id.) Rodriguez's attention and concentration were intact, recent and remote memory skills were mildly impaired, intellectual functioning was average, and her insight and judgment were fair. (R. 576-77.) Rodriguez reported that she was able to dress, bathe, and groom herself with some difficulty due to pain, and cooked, cleaned and did laundry with her family's assistance. (R. 577.) Dr. Fujiwaki opined that Rodriguez was able to follow and understand simple directions and instructions, perform simple tasks independently, maintain a regular schedule, learn new tasks, perform certain complex tasks independently, and make appropriate decisions. (Id.) Rodriguez had a mild limitation maintaining attention and concentration, relating adequately with others and appropriately dealing with stress; Dr. Fujiwaki believed that these difficulties were "caused by emotional distress secondary to medical problems." (Id.)

The same day, August 13, 2013, Dr. Fujiwaki completed a medical source statement of ability to do work-related activities. (R. 579-81.) Dr. Fujiwaki opined that Rodriguez had no limitations in her ability to understand, remember or carry out simple instructions, make judgments

on simple work-related decisions, understand and remember complex instructions, or interact appropriately with the public. (R. 579-80.) Rodriguez had mild limitations in her ability to carry out complex instructions, make judgments on complex work-related decisions, and interact appropriately with supervisors and coworkers, and a moderate limitation in her ability to respond appropriately to usual work situations and to changes in a routine work setting. (Id.)

**ALJ Dorf's Decision**

On March 24, 2014, ALJ Dorf denied Rodriguez's application for benefits. (R. 29-41.) ALJ Dorf applied the appropriate five step legal analysis. (R. 34-41.) First, he found that Rodriguez "has not engaged in substantial gainful activity since October 21, 2010, the alleged onset date." (R. 34.) Second, ALJ Dorf found that Rodriguez had the "following severe impairments: degenerative disc disease of the cervical, lumbar, and lumbosacral spines; and, obesity." (Id.) Third, ALJ Dorf found that Rodriguez did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1," in particular listing 1.04. (R. 36.) ALJ Dorf determined that Rodriguez had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. § 404.1567(a). (R. 36.)

ALJ Dorf noted that while Drs. Varma and Gondolo indicated that Rodriguez would be disabled for a period of at least 12 consecutive months, neither treated Rodriguez for a significant period of time. (R. 37.) ALJ Dorf found that the reports of Drs. Varma and Gondolo were entitled to "only limited evidentiary weight since they do not show ongoing treatment for a period of at least 12 months; describe equivocal findings including largely normal neurological exams on most occasions; and, are inconsistent with later reports as well as [Rodriguez's] statements to other treating physicians." (Id.) ALJ Dorf noted that later treatment records indicated that Rodriguez's

back pain and resulting limitations improved with treatment "to the extent [she] regained the capacity to perform sedentary type work activities within 12 months of the alleged disability onset date," which was consistent with Dr. Rozo's treatment notes. (R. 37-38.) In particular, ALJ Dorf wrote, Dr. Rozo treated Rodriguez from 2011 through 2013, and his records only indicate reports of back pain twice in 2011. (R. 38.) Moreover, "[a]lmost all [of Dr. Rozo's] notations describe [Rodriguez] as being well developed and in no acute distress." (Id.) While Rodriguez required extensive treatment including physical therapy, along with "some significant changes in her lumbar and lumbosacral spines consistent with a severe impairment," these conditions predated the disability onset date and/or were aggravated by Rodriguez's previous medium work. (Id.) Moreover, there were no significant neurological findings, evidence of herniated discs, or any surgery recommendations from Rodriguez's physicians, and Rodriguez's "own statements to treating physicians at Queens Medical Associates . . . document that rather than being an aggravating factor, sitting actually relieved her pain." (Id.)

ALJ Dorf gave no weight to Dr. Balmaceda's February 12, 2012 spinal impairment questionnaire that stated Rodriguez was significantly limited in her ability to sit, stand or walk, because neurological examinations performed on February 7, 2012 and February 10, 2012 were normal, as was Rodriguez's gait. (Id.)[4/] ALJ Dorf likewise gave no weight to the assessments of Drs. Goldin, Mescon and Salon since they were based on one-time examinations and provided assessments that were either significantly more or less limiting than the clinical findings supported. (Id.) Moreover, Dr. Rozo's extensive treatment notes, "including reports concerning [Rodriguez's] treatment both immediately before and after Dr. Goldin's July 2012 exam . . .[,] did not indicate

---

[4/]     Although ALJ Dorf only explicitly referenced Dr. Balmaceda's February 10, 2012 treatment notes, he cites the February 7, 2012 record as well for the same proposition. (See R. 38.)

significant complaints or findings associated with a severe back impairment." (R. 38.) For these reasons, ALJ Dorf also declined to give "significant weight" to physical therapist Arguelles' opinion. (R. 39.)

ALJ Dorf concluded that Rodriguez's statements to physicians at Queens Medical Associates and to Dr. Rozo in particular were consistent with her ability to perform the full range of sedentary work. (Id.) Moreover, ALJ Dorf wrote: "based on more recent records documenting significantly less treatment for her back condition, and a pain assessment of zero, it appears that [Rodriguez's] residual functional capacity has increased beyond the sedentary level." (Id.)

At the fourth step, ALJ Dorf determined that Rodriguez is unable to perform any past relevant work. (Id.) Given Rodriguez's "age, education, work experience, and residual functional capacity," ALJ Dorf determined that "there are jobs that exist in significant numbers in the national economy" that she could perform. (R. 40.) ALJ Dorf noted that Rodriguez is considered an individual of younger age, has a high school education, and is able to communicate in English. (R. 39.) ALJ Dorf relied on vocational expert Helene Feldman's testimony that a person with Rodriguez's characteristics and limitations could perform the unskilled sedentary positions of plastic design applier, stuffer, and gauger. (R. 40.) ALJ Dorf further noted that:

> Even if the undersigned found that [Rodriguez] had additional limitations on her ability to perform the requirements of sedentary work including the need for a sit-stand option; no English reading or writing required; only occasional overhead reaching; simple repetitive tasks at low stress defined as no decision-making required; occasional contact with coworkers, supervisors, and the public; and no postural limitations except for only occasional stairs, the vocational expert testified that given all of these factors the individual would be able to perform the requirements of [these positions].

(Id.; see R. 65.) Accordingly, ALJ Dorf concluded that Rodriguez "has not been under a disability, as defined in the Social Security Act, from October 21, 2010, through the [March 24, 2014] date of

[his] decision." (R. 40.)

**ANALYSIS**

I. **THE APPLICABLE LAW**

 A. **Definition Of Disability**

  A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Impala v. Astrue, 477 F. App'x 856, 857 (2d Cir. 2012).[5/]

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S.

---

[5/] See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 F. App'x 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart, 163 F. App'x 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 F. App'x 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

Ct. at 379; <u>Barnhart</u> v. <u>Walton</u>, 535 U.S. at 218, 122 S. Ct. at 1270.[6/]

      In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." <u>Mongeur</u> v. <u>Heckler</u>, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[7/]

**B.    <u>Standard Of Review</u>**

      A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record as a whole to support such determination. <u>E.g.</u>, 42 U.S.C. § 405(g); <u>Giunta</u> v. <u>Comm'r of Soc. Sec.</u>, 440 F. App'x 53, 53 (2d Cir. 2011).[8/] "'Thus, the role of the district court is quite limited and substantial deference is to be afforded to the Commissioner's decision.'" <u>Morris</u> v. <u>Barnhart</u>, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y.

---

[6/]    See also, <u>e.g.</u>, <u>Salmini</u> v. <u>Comm'r of Soc. Sec.</u>, 371 F. App'x at 111; <u>Betances</u> v. <u>Comm'r of Soc. Sec.</u>, 206 F. App'x at 26; <u>Butts</u> v. <u>Barnhart</u>, 388 F.3d at 383; <u>Draegert</u> v. <u>Barnhart</u>, 311 F.3d at 472; <u>Shaw</u> v. <u>Chater</u>, 221 F.3d at 131-32; <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d at 77; <u>Balsamo</u> v. <u>Chater</u>, 142 F.3d at 79.

[7/]    See, <u>e.g.</u>, <u>Brunson</u> v. <u>Callahan</u>, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); <u>Brown</u> v. <u>Apfel</u>, 174 F.3d at 62.

[8/]    See also, <u>e.g.</u>, <u>Prince</u> v. <u>Astrue</u>, 514 F. App'x 18, 19 (2d Cir. 2013); <u>Salmini</u> v. <u>Comm'r of Soc. Sec.</u>, 371 F. App'x 109, 111 (2d Cir. 2010); <u>Acierno</u> v. <u>Barnhart</u>, 475 F.3d 77, 80-81 (2d Cir.), <u>cert. denied</u>, 551 U.S. 1132, 127 S. Ct. 2981 (2007); <u>Halloran</u> v. <u>Barnhart</u>, 362 F.3d 28, 31 (2d Cir. 2004); <u>Jasinski</u> v. <u>Barnhart</u>, 341 F.3d 182, 184 (2d Cir. 2003); <u>Veino</u> v. <u>Barnhart</u>, 312 F.3d 578, 586 (2d Cir. 2002); <u>Shaw</u> v. <u>Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000); <u>Brown</u> v. <u>Apfel</u>, 174 F.3d 59, 61 (2d Cir. 1999); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d 72, 77 (2d Cir. 1999); <u>Tejada</u> v. <u>Apfel</u>, 167 F.3d 770, 773 (2d Cir. 1999); <u>Perez</u> v. <u>Chater</u>, 77 F.3d 41, 46 (2d Cir. 1996); <u>Rivera</u> v. <u>Sullivan</u>, 923 F.2d 964, 967 (2d Cir. 1991); <u>Mongeur</u> v. <u>Heckler</u>, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); <u>Dumas</u> v. <u>Schweiker</u>, 712 F.2d 1545, 1550 (2d Cir. 1983).

July 26, 2002) (Peck, M.J.).[9/]

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74.[10/] "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence." Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983). The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'" Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[11/]

The Court, however, will not defer to the Commissioner's determination if it is "'the product of legal error.'" E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); see also, e.g., Douglass v. Astrue, 496 F. App'x 154, 156 (2d Cir. 2012); Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Tejada v. Apfel, 167 F.3d at 773 (citing cases).

---

[9/] See also, e.g., Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

[10/] See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Brown v. Apfel, 174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

[11/] See also, e.g., Campbell v. Astrue, 465 F. App'x 4, 6 (2d Cir. 2012); Veino v. Barnhart, 312 F.3d at 586.

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims. 20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct. 2287, 2291 (1987). The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability. If at any step a finding of disability or nondisability can be made, the SSA will not review the claim further. [1] At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity." [2] At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. & citations omitted).[12]

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only his medical capacity but also his age, education and training. See,

---

[12] Accord, e.g., Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 774; see also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Shaw v. Chater, 221 F.3d at 132; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[13]

C.    **The Treating Physician Rule**

The "treating physician's rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion. Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2); see, e.g., Rugless v. Comm'r of Soc. Sec., 548 F. App'x 698, 699-700 (2d Cir. 2013); Meadors v. Astrue, 370 F. App'x 179, 182 (2d Cir. 2010); Colling v. Barnhart, 254 F. App'x 87, 89 (2d Cir. 2007); Lamorey v. Barnhart, 158 F. App'x 361, 362 (2d Cir. 2006).

Further, the regulations specify that when controlling weight is not given a treating physician's opinion (because it is not "well-supported" by other medical evidence), the ALJ must consider the following factors in determining the weight to be given such an opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant.  20 C.F.R. § 404.1527(c)(2)-(6); see, e.g., Cichocki v. Astrue, 534 F. App'x 71, 74 (2d

---

[13]    See also, e.g., Selian v. Astrue, 708 F.3d at 418; Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at 467.

Cir. 2013); <u>Gunter</u> v. <u>Comm'r of Soc. Sec.</u>, 361 F. App'x 197, 197 (2d Cir. 2010).[14]

When a treating physician provides a favorable report, the claimant "is entitled to an express recognition from the [ALJ or] Appeals Council of the existence of [the treating physician's] favorable . . . report and, if the [ALJ or] Council does not credit the findings of that report, to an explanation of why it does not."  <u>Snell</u> v. <u>Apfel</u>, 177 F.3d 128, 134 (2d Cir. 1999); <u>see</u>, <u>e.g.</u>, <u>Cichocki</u> v. <u>Astrue</u>, 534 F. App'x at 75; <u>Zabala</u> v. <u>Astrue</u>, 595 F.3d 402, 409 (2d Cir. 2010) (ALJ's failure to consider favorable treating physician evidence ordinarily requires remand pursuant to <u>Snell</u> but does not require remand where the report was "essentially duplicative of evidence considered by the ALJ"); <u>Ferraris</u> v. <u>Heckler</u>, 728 F.2d 582, 587 (2d Cir. 1984) ("We of course do not suggest that every conflict in a record be reconciled by the ALJ or the Secretary, but we do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable [reviewing courts] to decide whether the determination is supported by substantial evidence." (citations omitted)); <u>Ramos</u> v. <u>Barnhart</u>, 02 Civ. 3127, 2003 WL 21032012 at *7, *9 (S.D.N.Y. May 6, 2003) (The ALJ's "'failure to mention such [treating physician report] evidence and set forth the reasons for his conclusions with sufficient specificity hinders [this Court's] ability . . . to decide whether his determination is supported by substantial evidence.'").

The Commissioner's "treating physician" regulations were approved by the Second Circuit in <u>Schisler</u> v. <u>Sullivan</u>, 3 F.3d 563, 568 (2d Cir. 1993).[15]

---

[14]  See also, <u>e.g.</u>, <u>Foxman</u> v. <u>Barnhart</u>, 157 F. App'x 344, 346-47 (2d Cir. 2005); <u>Halloran</u> v. <u>Barnhart</u>, 362 F.3d 28, 32 (2d Cir. 2004); <u>Shaw</u> v. <u>Chater</u>, 221 F.3d 126, 134 (2d Cir. 2000); <u>Clark</u> v. <u>Comm'r of Soc. Sec.</u>, 143 F.3d 115, 118 (2d Cir. 1998); <u>Schaal</u> v. <u>Apfel</u>, 134 F.3d 496, 503 (2d Cir. 1998).

[15]  Although not relevant here, the Court notes that the regulations governing the "treating physician rule" recently changed as to claims filed on or after March 27, 2017.  See 20
(continued...)

II.    **APPLICATION OF THE FIVE STEP SEQUENCE**

A.    **Rodriguez Was Not Engaged In Substantial Gainful Activity**

The first inquiry is whether Rodriguez was engaged in substantial gainful activity after her application for DIB. "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510. ALJ Dorf's conclusion that Rodriguez did not engage in substantial gainful activity during the applicable time period (see page 17 above) is not disputed and benefits Rodriguez. (See generally Dkt. No. 15: Comm'r Br.) The Court therefore proceeds with the analysis.

B.    **Rodriguez Demonstrated "Severe" Impairments That Significantly Limited Her Ability To Do Basic Work Activities**

The second step of the analysis is to determine whether Rodriguez proved that she had a severe impairment or combination of impairments that "significantly limit[ed her] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1522(b). "Basic work activities" include:

> walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking . . . [u]nderstanding, carrying out, and remembering simple instructions . . . [u]se of judgment . . . [r]esponding appropriately to supervision, co-workers and usual work situations . . . [d]ealing with changes in a routine work setting.

20 C.F.R. § 404.1522(b)(1)-(6).

ALJ Dorf determined that Rodriguez's severe impairments were degenerative disc

---

[15/]    (...continued)
C.F.R. §§ 404.1527, 404.1520c; Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, 2017 WL 168819 at *5844, *5867-68 (Jan. 18, 2017).

disease of the cervical, lumbar, and lumbosacral spines and obesity.  (See page 17 above.)  ALJ Dorf's findings regarding the step-two severity of these impairments benefit Rodriguez, and Rodriguez does not contest those findings.  (See generally Dkt. No. 11: Rodriguez Br.)  Accordingly, the Court proceeds to the third step of the five-part analysis.

  **C.**  **Rodriguez Did Not Have A Disability Listed In Appendix 1 Of The Regulations**

    The third step of the five-step test requires a determination of whether Rodriguez had an impairment listed in Appendix 1 of the Regulations.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment.  If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits."  Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995).

    ALJ Dorf found that notwithstanding Rodriguez's severe impairments, she did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1," in particular listing 1.04. (See page 17 above.)  ALJ Dorf stated that he compared the record medical evidence to the listing requirements, and found that Rodriguez had not met the necessary criteria.  (R. 36.)  Because ALJ Dorf's finding that Rodriguez's impairments do not meet or medically equal the listed conditions is not disputed by the parties (see generally Dkt. No. 11: Rodriguez Br.; Dkt. No. 15: Comm'r Br.), the Court proceeds with the five-step analysis.

  **D.**  **ALJ Dorf's Credibility and RFC Determinations**

    Before proceeding to step four, the Court will address ALJ Dorf's credibility and residual functional capacity ("RFC") determinations.

### 1.    Credibility Determination

Because subjective symptoms only lessen a claimant's RFC where the symptoms "'can reasonably be accepted as consistent with the objective medical evidence and other evidence,' the ALJ is not required to accept allegations regarding the extent of symptoms that are inconsistent with the claimant's statements or similar evidence." Moulding v. Astrue, 08 Civ. 9824, 2009 WL 3241397 at *7 (S.D.N.Y. Oct. 8, 2009) (citation & emphasis omitted); see, e.g., Campbell v. Astrue, 465 F. App'x 4, 7 (2d Cir. 2012) ("As for the ALJ's credibility determination, while an ALJ 'is required to take the claimant's reports of pain and other limitations into account,' he or she is 'not require[d] to accept the claimant's subjective complaints without question.' Rather, the ALJ 'may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.'" (citations omitted)); Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) ("When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." (citations omitted)); Brown v. Comm'r of Soc. Sec., 310 F. App'x 450, 451 (2d Cir. 2009) ("'Where there is conflicting evidence about a claimant's pain, the ALJ must make credibility findings.'").[16]  In addition, "courts must show special deference to an

---

[16]    See also, e.g., Rivers v. Astrue, 280 F. App'x 20, 22 (2d Cir. 2008) (same); Thompson v. Barnhart, 75 F. App'x 842, 845 (2d Cir. 2003) (ALJ properly found that plaintiff's "description of her symptoms was at odds with her treatment history, her medication regime, and her daily routine"); Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999); Norman v. Astrue, 912 F. Supp. 2d 33, 85 (S.D.N.Y. 2012) ("It is 'within the discretion of the [Commissioner] to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology.'"); Astolos v. Astrue, No. 06-CV-678, 2009 WL 3333234 at *12 (W.D.N.Y. Oct. 14, 2009) (ALJ properly determined that plaintiff's subjective pain
(continued...)

ALJ's credibility determinations because the ALJ had the opportunity to observe plaintiff's demeanor while [the plaintiff was] testifying." Marquez v. Colvin, 12 Civ. 6819, 2013 WL 5568718 at *7 (S.D.N.Y. Oct. 9, 2013).[17/]

       When an ALJ determines that a claimant's own statements regarding her symptoms are not supported by the record, that "decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2016 WL 1119029 at *9 (Mar. 16, 2016). The regulations set out a two-step process for assessing a claimant's statements about pain and other limitations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. . . . If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record. The ALJ must consider statements the claimant or others make about his

---

[16/] (...continued)
complaints were not supported by the medical record); Speruggia v. Astrue, No. 05-CV-3532, 2008 WL 818004 at *11 (E.D.N.Y. Mar. 26, 2008) ("The ALJ 'does not have to accept plaintiff's subjective testimony about her symptoms without question' and should determine a plaintiff's credibility 'in light of all the evidence.'"); Soto v. Barnhart, 01 Civ. 7905, 2002 WL 31729500 at *6 (S.D.N.Y. Dec. 4, 2002) ("The ALJ has the capacity and the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of pain alleged by the claimant."); Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987) (same).

[17/] Accord, e.g., Campbell v. Astrue, 465 F. App'x 7 ("[W]e have long held that '[i]t is the function of the [Commissioner], not ourselves, . . . to appraise the credibility of witnesses, including the claimant.'"); Nunez v. Astrue, 11 Civ. 8711, 2013 WL 3753421 at *7 (S.D.N.Y. July 17, 2013); Guzman v. Astrue, 09 Civ. 3928, 2011 WL 666194 at *7 (S.D.N.Y. Feb. 4, 2011); Ruiz v. Barnhart, 03 Civ. 10128, 2006 WL 1273832 at *7 (S.D.N.Y. May 10, 2006); Gernavage v. Shalala, 882 F. Supp. 1413, 1419 & n.6 (S.D.N.Y. 1995); Mejias v. Soc. Sec. Admin., 445 F. Supp. 741, 744 (S.D.N.Y. 1978) (Weinfeld, D.J.); Wrennick v. Sec'y of Health, Educ. & Welfare, 441 F. Supp. 482, 485 (S.D.N.Y. 1977) (Weinfeld D.J.).

impairment(s), his restrictions, his daily activities, his efforts to work, or any other relevant statements he makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in its administrative proceedings.

Genier v. Astrue, 606 F.3d at 49 (quotations, citation & brackets omitted) (citing 20 C.F.R. §§ 404.1529(a), 404.1529(b), and the now-superseded SSR 96-7p); see also SSR 16-3p, 2016 WL 1119029 at *2; Burgess v. Colvin, 15 Civ. 9585, 2016 WL 7339925 at *11 (S.D.N.Y. Dec. 19, 2016) (quoting SSR 16-3p for an explanation of the two-step process for assessing claimants' statements about their symptoms).

In March 2016, the SSA released SSR 16-3p, which provides updated guidance on evaluating a claimant's claims about the work-preclusive nature of her symptoms.  See generally SSR 16-3p, 2016 WL 1119029; accord, e.g., Duran v. Colvin, 14 Civ. 8677, 2016 WL 5369481 at *13 n.27 (S.D.N.Y. Sept. 26, 2016) ("SSR 16-3p supersedes SSR 96-7p, 1996 WL 374186 (July 2, 1996), and clarifies the policies set forth in the previous SSR.").

The purpose of [SSR 16-3p] is to provide "guidance about how [to] evaluate statements regarding the intensity, persistence, and limiting effects of symptoms in disability claims." S.S.R. 16-3P, 2016 WL 1119029, at *1.  The Ruling supersedes . . . S.S.R. 96-7p, which placed a stronger emphasis on the role of the adjudicator to make a "finding about the credibility of the individual's statements about the symptom(s) and its functional effects." S.S.R. 96-7P, 1996 WL 374186, at *1.  In contrast, S.S.R. 16-3p espouses a more holistic analysis of the claimant's symptoms, and "eliminate[s] the use of the term 'credibility'" from sub-regulation policy.  S.S.R. 16-3P, 2016 WL 1119029, at *1.  The Commissioner notes that the "regulations do not use this term," and by abandoning it, "clarif[ies] that subjective symptom evaluation is not an examination of an individual's character." Id.

Acosta v. Colvin, 15 Civ. 4051, 2016 WL 6952338 at *18 (S.D.N.Y. Nov. 28, 2016).

ALJ Dorf reviewed Rodriguez's testimony and the medical evidence.  (R. 36-38.) Rodriguez testified that she sometimes is able to lift and change her seven month old, who weighs seventeen pounds, and take him to appointments or the grocery store once every one or two weeks.

(<u>See</u> page 2 above.)  She also testified that she can lift a gallon of milk, has no issues with personal care, and watches television and talks on the phone daily.  (<u>Id.</u>)  Rodriguez experiences pain in her arms and back when she cooks or washes dishes.  (<u>Id.</u>)  When her husband is unavailable, Rodriguez drives to appointments, or takes the bus or train.  (<u>Id.</u>)  Rodriguez does not use an assistive device such as a cane when she "take[s] the train, or bus, or walk[s]" although she suffers from low back pain and testified that she "can only stand up for two minutes because [her] muscles start bothering" her.  (<u>Id.</u>)  Rodriguez testified that she can walk two blocks before she has to stop and rest, and testified that she can only sit for ten to twenty minutes at a time, but there are times when even sitting is unbearable and she has to lay down.  (<u>See</u> page 3 above.)  Rodriguez described the pain in her neck and back as an eight to nine out of ten.  (<u>Id.</u>)

ALJ Dorf appropriately applied the two-part credibility test and supported his findings with substantial evidence in Rodriguez's treatment records regarding her physical impairments.  (R. 36-38.)  ALJ Dorf found that Rodriguez's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but her "statements concerning the intensity, persistence, and limiting effects of these symptoms" were "not entirely credible."  (R. 36.)  ALJ Dorf found that Rodriguez's symptoms improved with treatment, citing Dr. Rozo's treatment reports from 2011 through 2013 that only reference back pain twice and include a pain assessment of zero on June 21, 2013.  (<u>See</u> pages 9, 17, 19 above.)

Rodriguez argues that while she "may not have been in 'acute' distress at some office visits, this does not equate with a finding that she would be able to sustain the demands . . . [of] a competitive work environment. . . .  The ALJ's reference to a single note where Ms. Rodriguez stated her pain was 'zero' is not indicative of her functioning over a sustained period . . . ."  (Dkt. No. 11: Rodriguez Br. at 20-21.)  Rodriguez ignores that, in addition to stating that her pain was not "acute,"

Dr. Rozo's records on thirteen occasions from October 9, 2010 through January 20, 2013 do not bold "Back Pain," and state that Rodriguez had "[n]o back tenderness" and appeared "[a]lert, well developed, well nourished [and] in no acute distress." (See page 9 above; Dkt. No. 15: Comm'r Br. at 21 ("Indeed, except for a few instances of back tenderness, Dr. Rozo repeated these findings throughout the period under review.").) RPAC Perez made the same observations on June 21, 2013 and July 12, 2013, noting a pain assessment of zero during the former visit. (See page 9 above.) Moreover, ALJ Dorf also noted that Rodriguez's more recent lumbar and cervical spine MRIs did "not show significant changes from previous studies," there were no significant ongoing neurological findings or surgery recommendations from Rodriguez's treating physicians, and Rodriguez reported on at least one occasion that sitting relieved her pain. (R. 37-38; see page 18 above.) ALJ Dorf properly determined that the severity of Rodriguez's subjective complaints was not supported by her treatment records as a whole, and that she has the ability to perform sedentary work. (R. 39; see page 35 below.) If this Court were the fact finder, it might have reached a different conclusion, but the Court cannot say that ALJ Dorf's opinion was erroneous as a matter of law or that it is not supported by substantial evidence.

### 2.    Residual Functional Capacity Determination

ALJ Dorf determined that Rodriguez had the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a). (See page 17 above.) Sedentary work

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

ALJ Dorf's RFC determination was based on his review of Rodriguez's testimony and

the medical evidence. (See pages 17-19 above.) However, Rodriguez argues that ALJ Dorf improperly rejected the opinions from Drs. Varma, Balmaceda and Goldin. (Dkt. No. 11: Rodriguez Br. at 15-19.) Rodriguez claims that ALJ Dorf highlighted the normal portions of Dr. Varma's and Balmaceda's treatment records and improperly found that they outweighed the abnormal findings without adequate explanation. (Id. at 16.) Moreover, Rodriguez claims that Dr. Varma's and Dr. Balmaceda's opinions "are uncontradicted by any other evidence credited by the ALJ." (Id. at 17.) Rodriguez further argues that ALJ Dorf erred by finding that Dr. Goldin's opinions were unsupported by any clinical evidence. (Id. at 16.)

   ALJ Dorf found that Dr. Varma's opinions were entitled to "only limited evidentiary weight since they do not show ongoing treatment for a period of at least 12 months; describe equivocal findings including largely normal neurological exams on most occasions; and, are inconsistent with later reports as well as [Rodriguez's] statements to other treating physicians." (See page 17 above.) ALJ Dorf was entitled to consider the length of the treatment relationship, the frequency of examination and the consistency of the treating physician's opinion with the record as a whole. (See page 24 above); see, e.g., Monroe v. Comm'r of Soc. Sec., 676 F. App'x 5, 7 (2d Cir. 2017). Dr. Varma treated Rodriguez for approximately three months from September 20, 2010 through January 3, 2011. (See pages 3-4 above.) Dr. Varma's September and October 2010 treatment notes state that Rodriguez's thoracic and lumbar pain was worsening, but also note that Rodriguez's strength was "[g]ood 5/5 in all" muscle groups in the upper and lower extremities with no wasting, weakness, atrophy or fasciculations noted during the former visit. (Id.) More importantly, ALJ Dorf found that Rodriguez's later treatment notes did not support Dr. Varma's severe limitations, in particular Dr. Rozo's and RPAC Perez's multiple treatment records that include no mention of back pain and post-date Dr. Varma's findings by over two years. (See page 9

above.)[18/]

ALJ Dorf gave no weight to Dr. Balmaceda's findings in her February 12, 2012 spinal impairment questionnaire that Rodriguez was significantly limited in her ability to sit, stand or walk, because neurological examinations performed on February 7, 2012 and February 10, 2012 were normal. (See page 18 above.) In the February 12, 2012 questionnaire, Dr. Balmaceda opined that in an eight hour workday Rodriguez could sit for two hours and stand/walk for one hour, and would have to get up and move around every one to two hours for a period of fifteen to twenty minutes before sitting again. (See page 10 above.) However, on February 7, 2012 and February 10, 2012, Rodriguez appeared alert and oriented in no acute distress with normal motor strength, reflexes and gait, and full range of motion. (See pages 9-10 above.) These and other normal findings appear in Dr. Balmaceda's later records as well and, as ALJ Dorf noted, "[m]ore recent MRI studies of the cervical and lumbar spine do not show significant changes from previous studies." (R. 38.)[19/]

---

[18/]    Given the multiple records from Dr. Rozo supporting ALJ Dorf's opinion, the Court rejects Rodriguez's argument that ALJ Dorf substituted his own judgment in lieu of competent medical evidence. (Rodriguez Br. at 16); see, e.g., Vasquez v. Berryhill, 16 Civ. 6707, 2017 WL 1592761 at *16 n.25 (S.D.N.Y. May 1, 2017) (Peck, M.J.). For the same reasons, the Court rejects the argument that ALJ Dorf failed to cite any record evidence specifically stating that Rodriguez could sit at least six hours in an eight hour workday. (Rodriguez Br. at 18.) Rodriguez ignores that the ALJ "is entitled to rely not only on what the record says, but also on what it does not say." Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983); see also, e.g., Ferreira v. Berryhill, 16 Civ. 6772, 2017 WL 2398705 at *6 & n.10 (S.D.N.Y. June 2, 2017) (Peck, M.J.) (citing cases); Vasquez v. Berryhill, 2017 WL 1592761 at *15 n.21.

[19/]    See, e.g., R. 670-78 (5/1/12, 7/18/12 & 4/22/13: complaints of chronic neck and back pain, but alert and oriented in no acute distress, with normal gait, reflexes and motor strength, and full range of motion); R. 598 (6/28/13: lumbar spine MRI showing "[a]ll lumbar vertebral bodies are maintained in height" with "no evidence of fracture, marrow replacement disease, spinal stenosis or intrathecal mass"); R. 735 (9/27/13: cervical spine MRI showing no interval change in appearance from MRI on November 21, 2011); R. 727 (1/14: moderate pain when standing).

Moreover, although ALJ Dorf did not explicitly compare Dr. Balmaceda's findings to Dr. Rozo's, the Court notes that Dr. Rozo's records provide further longitudinal evidence contrary to Dr. Balmaceda's severe limitations. (See page 9 above; Dkt. No. 15: Comm'r Br. at 21, 23.) ALJ Dorf was entitled to note the internal inconsistencies within Dr. Balmaceda's records and discount her opinion accordingly. See, e.g., Micheli v. Astrue, 501 F. App'x 26, 28 (2d Cir. 2012) ("A physician's opinions are given less weight when his opinions are internally inconsistent."); Flanigan v. Colvin, 21 F. Supp. 3d 285, 306 n.23 (S.D.N.Y. 2014) (Peck, M.J.).

Finally, ALJ Dorf rejected Dr. Goldin's opinion because it was more limiting than the medical records supported, and was based on a one-time examination. (See page 18 above.) ALJ Dorf explained that Dr. Rozo's treatment notes, "including reports concerning [Rodriguez's] treatment both immediately before and after Dr. Goldin's July 2012 exam . . .[,] did not indicate significant complaints or findings associated with a severe back impairment." (R. 38; see page 18 above.) ALJ Dorf was entitled to reject Dr. Goldin's opinion after considering the length of the treating relationship and the consistency of Dr. Goldin's opinion with the record as a whole, including Dr. Rozo's records both before and after her examination that did not indicate such severe impairments. (See page 9 above.)

The Court accordingly finds that ALJ Dorf's RFC assessment appropriately applied the treating physician rule, and was supported by substantial record evidence.[20]

---

[20] The Court acknowledges that Drs. Varma, Balmaceda and Goldin completed spinal impairment questionnaires on June 8, 2011, February 12, 2012 and July 6, 2012, stating Rodriguez only could stand or walk for one to two hours, and sit for two to four hours, in an eight-hour workday. (See pages 4-5, 10-11, 14-15 above.) Thus, there is some consistency among these doctors' opinions, at least as to Rodriguez's ability to sit and stand during a normal workday. However, the fact that Dr. Varma opined that Rodriguez could sit for four hours (see page 4 above), where Dr. Balmaceda's opinion was two hours (see page 10 above) (continued...)

**E.      Rodriguez Did Not Have The Ability to Perform Her Past Relevant Work**

The fourth step of the five-step analysis asks whether Rodriguez had the residual

functional capacity to perform her past relevant work.  (See page 23 above.)  Rodriguez previously

worked as a home attendant and babysitter.  (See page 3 above.)  ALJ Dorf concluded that

Rodriguez did not have the ability to perform her past relevant work.  (See page 19 above.)  Because

this finding favors Rodriguez and is not contested by either party, the Court proceeds to the fifth and

final step of the analysis.

**F.      There Are Jobs In Substantial Numbers In The Economy That Rodriguez Can Perform**

In the fifth step, the burden shifts to the Commissioner, "who must produce evidence

to show the existence of alternative substantial gainful work which exists in the national economy

and which the claimant could perform, considering not only his physical capability, but as well his

age, his education, his experience and his training."  Parker v. Harris, 626 F.2d 225, 231 (2d Cir.

---

[20]/      (...continued)
and Dr. Goldin's opinion was three to four hours (see page 15 above), shows how subjective these opinions are; they no doubt are based on Rodriguez's subjective complaints, which ALJ Dorf found to be not entirely credible (see pages 30-32 above), not on any objective medical evidence.  Again, the Court might have reached a different opinion if it were the ALJ, but the Court cannot say that ALJ Dorf's RFC determination was the product of legal error or that it was not supported by substantial evidence.  ALJ Dorf was entitled to rely on, among other things, Dr. Rozo and RPAC Perez's treatment records from approximately October 2010 through July 2013, the length of the treating relationship with Drs. Varma, Balmaceda and Goldin, and whether the objective evidence as a whole supported their opinions.  See, e.g., Micheli v. Astrue, 501 F. App'x at 28 ("'[A] treating physician's statement that the claimant is disabled cannot itself be determinative.'  It is the Commissioner who is 'responsible for making the determination or decision about whether [the claimant] meet[s] the statutory definition of disability.'  Moreover, the deference accorded to a treating physician's opinion may be reduced upon consideration of other factors, including the length and nature of the treating doctor's relationship with the patient, the extent to which the medical evidence supports the doctor's opinion, whether the doctor is a specialist, the consistency of the opinion with the rest of the medical record, and any other factors 'which tend to . . . contradict the opinion.'" (citations omitted)).

1980).<u>21/</u>

In meeting his burden under the fifth step, the Commissioner:

> may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid". The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy. Generally the result listed in the Grid is dispositive on the issue of disability.

<u>Zorilla</u> v. <u>Chater</u>, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (fn. omitted); <u>see</u>, <u>e.g.</u>, <u>Heckler</u> v. <u>Campbell</u>, 461 U.S. 458, 461-62, 465-68, 103 S. Ct. 1952, 1954-55, 1956-58 (1983) (upholding the promulgation of the Grid); <u>Roma</u> v. <u>Astrue</u>, 468 F. App'x at 20-21; <u>Martin</u> v. <u>Astrue</u>, 337 F. App'x 87, 90 (2d Cir. 2009); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d at 78; <u>Perez</u> v. <u>Chater</u>, 77 F.3d 41, 46 (2d Cir. 1996); <u>Bapp</u> v. <u>Bowen</u>, 802 F.2d 601, 604 (2d Cir. 1986).

However, "relying solely on the Grids is inappropriate when nonexertional limitations 'significantly diminish' plaintiff's ability to work so that the Grids do not particularly address plaintiff's limitations." <u>Vargas</u> v. <u>Astrue</u>, 10 Civ. 6306, 2011 WL 2946371 at *13 (S.D.N.Y. July 20, 2011); <u>see also</u>, <u>e.g.</u>, <u>Travers</u> v. <u>Astrue</u>, 10 Civ. 8228, 2011 WL 5314402 at *10 (S.D.N.Y. Nov. 2, 2011) (Peck, M.J.), <u>R. & R. adopted</u>, 2013 WL 1955686 (S.D.N.Y. May 13, 2013); <u>Lomax</u> v. <u>Comm'r of Soc. Sec.</u>, No. 09-CV-1451, 2011 WL 2359360 at *3 (E.D.N.Y. June 6, 2011) ("Sole reliance on the grids is inappropriate, however, where a claimant's nonexertional impairments 'significantly limit the range of work permitted by his exertional limitations.'").

Rather, where the claimant's nonexertional limitations "'significantly limit the range

---

<u>21/</u>     <u>See</u>, <u>e.g.</u>, <u>Roma</u> v. <u>Astrue</u>, 468 F. App'x 16, 20 (2d Cir. 2012); <u>Arruda</u> v. <u>Comm'r of Soc. Sec.</u>, 363 F. App'x 93, 95 (2d Cir. 2010); <u>Butts</u> v. <u>Barnhart</u>, 388 F.3d 377, 381 (2d Cir. 2004), <u>amended on other grounds</u>, 416 F.3d 101 (2d Cir. 2005); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d 72, 77 (2d Cir. 1999).

of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (quoting Bapp v. Bowen, 802 F.2d at 605); see also, e.g., Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013) ("We have explained that the ALJ cannot rely on the Grids if a non-exertional impairment has any more than a 'negligible' impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony of a vocational expert."); Rosa v. Callahan, 168 F.3d at 82 ("Where significant nonexertional impairments are present at the fifth step in the disability analysis, however, 'application of the grids is inappropriate.' Instead, the Commissioner 'must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.'" (quoting & citing Bapp v. Bowen, 802 F.2d at 603, 605-06)); Suarez v. Comm'r of Soc. Sec., No. 09-CV-338, 2010 WL 3322536 at *9 (E.D.N.Y. Aug. 20, 2010) ("If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." (quoting Zabala v. Astrue, 595 F.3d at 411)).

ALJ Dorf properly relied on the testimony of vocational expert Helene Feldman, who testified that a person of Rodriguez's age, education, vocational background and RFC could not perform the duties of a home attendant or babysitter, but that jobs existed in significant numbers in the national economy that such an individual could perform, including plastic design applier, stuffer, and gauger. (See pages 3, 19 above.)[22/] These jobs are unskilled sedentary positions that could be performed either sitting or standing, and the vocational expert testified that they all exist in significant numbers in the national economy. (See page 3 above.) ALJ Dorf relied upon VE

_____

[22/] Rodriguez claims that she was not given a full opportunity to cross examine VE Feldman (Dkt. No. 11: Rodriguez Br. at 13), but does not state what questioning she would have pursued, or show that VE Feldman's testimony was flawed.

Feldman's testimony in reaching his step five determination when he specifically referred to those jobs in his findings.  (See page 19 above.)  Accordingly, ALJ Dorf's decision at step five was supported by substantial evidence.  See, e.g., Frazier v. Comm'r of Soc. Sec., 16 Civ. 4320, 2017 WL 1422465 at *18 (S.D.N.Y. Apr. 20, 2017) (Peck, M.J.).[23/]

---

[23/]    Although ALJ Dorf limited his RFC determination to sedentary work without additional restrictions, he asked VE Feldman to "assume a hypothetical individual [with a] sedentary residual functional capacity with a sit, stand at will option in place; occasional overhead reaching; limited to simple[,] repetitive work at low stress, defined as no decision making required; occasional contact with the public, co-employees, and supervisors; no postural, except occasional stairs."  (See page 3 n.1 above.)  Thus, as ALJ Dorf noted:

> Even if the undersigned found that the claimant had additional limitations on her ability to perform the requirements of sedentary work including the need for a sit-stand option; no English reading or writing required; only occasional overhead reaching; simple repetitive tasks at low stress defined as no decision-making required; occasional contact with coworkers, supervisors, and the public; and no postural limitations except for only occasional stairs, the vocational expert testified that given all of these factors the individual would be able to perform the requirements of  [the positions identified by VE Feldman].

(See page 19 above.)

## **CONCLUSION**

For the reasons set forth above, the Commissioner's determination that Rodriguez was not disabled within the meaning of the Social Security Act during the period from October 21, 2010 through March 24, 2014 is supported by substantial evidence. Accordingly, the Commissioner's motion for judgment on the pleadings (Dkt. No. 14) is <u>GRANTED</u> and Rodriguez's motion (Dkt. No. 10) is <u>DENIED</u>.

SO ORDERED.

Dated:       New York, New York
             August 28, 2017

_____
**Andrew J. Peck**
United States Magistrate Judge

Copies ECF to:       All Counsel